HEINE SAFETY BOILER CO. v. FRANCIS BROS. & JELLETT.

(Circuit Court of Appeals, Third Circuit.  June 30, 1902.)

No. 11.

1. CONTRACTS FOR BOILERS—CONSTRUCTION—"NOMINAL HORSE POWER."

In a contract for furnishing boilers for heating a building, it appearing that the words "nominal horse power" had no technical meaning in the trade, a requirement that each boiler should have a "capacity of 140 nominal horse power" must be construed as meaning its rated or professed horse power as distinguished from its capacity above or below its nominal horse power which it might actually develop when in use.

2. SAME—BREACH.

A contract for furnishing boilers for heating a building required that they should have a capacity of 140 nominal horse power, and that they should meet prescribed tests to determine their evaporating capacity under ordinary firing and their maximum capacity. Held, that each of such three requirements was an essential element of the contract, and that the boilers did not comply with the contract as to nominal horse power where the manufacturer admitted that they were rated at the shop, in accordance with its usual rules, as 130 horse power boilers.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

See 105 Fed. 413, and 112 Fed. 900.

J. H. McNeal and Joseph J. De Kinder, for plaintiff in error.

Frank P. Prichard, for defendant in error.

Before ACHESON and GRAY, Circuit Judges, and BRADFORD, District Judge.

ACHESON, Circuit Judge. By the written contract between the Heine Safety Boiler Company and Francis Bros. & Jellett, the former company agreed to furnish and erect for the latter company two boilers, each "having a capacity of one hundred and forty (140) nominal horse power," and each to be "capable of evaporating forty-two hundred (4,200) pounds of water, from and at 212 degrees Fahrenheit, per hour, with ordinary firing," and at a specified test to determine their maximum capacity, each boiler to show "an equivalent evaporation of not less than 5,200 pounds of water per hour from and at 212 degrees Fahrenheit." Thus, by the terms of the contract, the boilers in respect to capacity were to comply with three requisites, namely: They were to have—First, a nominal capacity of 140 horse power; second, a capacity of evaporating 4,200 pounds of water per hour and at 212 degrees Fahrenheit, with ordinary firing; third, a maximum capacity of evaporating 5,200 pounds of water per hour from and at 212 degrees Fahrenheit, at a prescribed test.

The parties who negotiated and concluded this contract, on the one side and the other, were experienced boiler makers and skilled engineers. Presumably, then, the descriptive words of the contract were intelligently and aptly chosen. It cannot be supposed that the provision that each boiler should have "a capacity of one hundred and forty nominal horse power" was meaningless or superfluous. The natural inference is that the stipulation as to a nominal capacity of 140 horse power, in the mutual understanding of the contracting parties, had a meaning different from either the stipulation relating to the designated capacity with ordinary firing or the stipulation as to maximum capacity under the prescribed test. Indeed, the uncontradicted evidence shows that an evaporation of 4,200 pounds of water per hour, from and at 212 degrees Fahrenheit, would produce only about 121 horse power, and that the evaporation of 5,200 pounds of water per hour, from and at 212 degrees Fahrenheit, would produce about 151 horse power. It is therefore demonstrable that the stipulated "capacity of one hundred and forty nominal horse power" meant something different from either of the other two designated capabilities. The boilers were to fulfill, not one or two of the prescribed conditions, but all three of them.

It appears that the words "nominal horse power" have no technical meaning in this trade. Therefore they are to be taken here in their ordinary sense. The descriptive phrase, "one hundred and forty nominal horse power," means, we think, the rated or professed capacity of the boilers as distinguished from the capacity above or be-

low their nominal horse power which they might actually develop when in use.

Under the evidence it was for the court to construe the contract, including the words respecting nominal horse power. The judge could not strike out those words nor ignore them as meaningless. The only thing to be done was to give them their ordinary signification, and it seems to us that the court rightly read the phrase, "having a capacity of one hundred and forty nominal horse power," as describing a boiler having such a rated or declared capacity.

Now, Mr. Meirer, the president of the Heine Safety Boiler Company, testified that every boiler that comes out of the company's shop is given a rating which is termed the "rated capacity of the boiler," and that this rating "is made up partly from the consideration of the amount of the heating surface and partly from our experience,—largely from our experience." And he also testified that the boilers in question, furnished and erected by the Heine Safety Boiler Company, were its "standard 130 horse power boilers"; that according to its "shop-rating" they were the company's "130 horse power boilers." Now, how can it be said that a boiler whose shop-rated and declared capacity was only 130 horse power fulfilled a stipulation calling for a boiler having a capacity of 140 nominal horse power? We are of opinion that upon the uncontradicted evidence the court below was right in holding that the Heine Company had failed to comply with the contract, in that the boilers it furnished and erected had a rated and professed or nominal capacity of 130 horse power only.

We find no error in this record, and accordingly the judgment of the circuit court is affirmed.